603 S.E.2d 598

**Sharon EMERY, Respondent,**

v.

**Ross J. SMITH, Appellant.**

**No. 3870.**

Court of Appeals of South Carolina.

Heard Sept. 14, 2004.
Decided Sept. 27, 2004.

W. Tracy Brown, of Charleston, for Appellant.

Gregory S. Forman, of Charleston, for Respondent.

ANDERSON, J.:

Sharon Emery (Emery) initiated this action against Ross J. Smith (Smith), her ex-husband, to enforce her right to 25% of his military retirement benefits. The family court rejected Smith's laches defense and ordered him to pay Emery 25% of the benefits received since his retirement in 1991. We affirm as modified and remand.

### *FACTUAL/PROCEDURAL BACKGROUND*

Smith was in the United States Navy when he and Emery were married in 1973. The couple remained married for sixteen years and had one child, a son born in 1975. Smith and Emery were divorced on January 12, 1989. In connection with the divorce, the parties entered into a property settlement agreement on December 12, 1988. The settlement agreement provided: (1) that Smith would pay Emery $6,000 in $200 monthly installments, beginning January 1, 1989; (2)

that Smith, the father, would have custody of their son; and (3) that Emery would pay $65 per month as child support. The agreement stated:

> Husband is on active duty with the United States Armed Forces and expects to retire after 20 years. Of this 20 year period, husband and wife have been married for approximately 15 years. Husband and Wife acknowledge and agree that they have reached a settlement as to the issue of an equitable division of his retirement income in that the wife shall receive, on a monthly basis, payable directly to the Wife, by direct payment from the applicable government agency, Twenty five (25%) percent of the Husband's total monthly retirement benefit at such time as retirement payments or benefits commence. Husband and Wife understand that this provision is contingent upon the Husband's retirement and receiving retirement benefits from the United States Armed Forces.

The divorce decree, signed January 12, 1989, approved the parties' agreement, adopted it, and merged the agreement into the decree. The decree contained the following mandate:

> That [Smith] **provide any and all information necessary** and sign any and all forms or documents necessary or convenient **to provide for [Emery] to receive by direct military allotment twenty five percent (25%) of the [Smith's] total military retirement (Pension)** that [Smith] subsequently receives due to retirement from the United States Armed Forces.

(Emphasis added).

After the divorce, Smith kept the marital home in Charleston, and Emery moved nearby to remain close to their son. The parties apparently maintained a civil relationship, but within a few months after the divorce, Emery stopped paying child support and Smith ceased paying the $200 per month to Emery. Smith retired from the military on June 30, 1991 and began receiving retirement benefits one month later. Emery, who remarried in December of 1991, did not receive any portion of the pension until shortly after the commencement of this litigation, in 2001, when she began receiving 25% of Smith's benefits directly from the government.

At trial, Smith admitted that he did not notify Emery of his retirement or tell her that he had begun receiving benefits:

Q: And did you provide any and all information necessary and sign any and all forms or documents necessary pursuant to this order to her?

A: No, Sir.

Q: Never?

A: No, Sir.

Furthermore, Emery testified that on at least one occasion she asked Smith about his retirement benefits but was provided no information:

Q: Did you, at any time, ask [Smith] about his retirement and about the money?

A: Yes.

Q: And when, if you can tell us, was that?

. . . .

A: I think I probably asked him once or twice about it.

Q: But when was it?

A: (No response.)

Q: How far back?

A: Let me—nine years or so.

Q: So sometime nine years from this date back? So That's 1995, '94?

A: Yeah——

Q: Somewhere around there?

A: Somewhere in there.

Q: And what was his response, if any, to you?

A: I wasn't given any information about his retirement. The date or——

Emery averred that she suffers from a number of medical conditions, including Anasara (a swelling of the body), fibromyalgia, a large hiatal hernia, and depression. Although she was able to work as a nurse after the divorce, the depression was so debilitating that she mostly stayed at home in bed when she was not working. She claimed that due to the depression, she lacked the energy to pursue her claim. Em-

ery attempted to discuss the pension with Smith before she commenced this action, but she testified he became very angry, causing her to avoid the subject with him.

Due to increasing medical bills, Emery eventually sought the help of an attorney. She filed this action on November 21, 2001, seeking enforcement of her ownership interest, as agreed to by her and her ex-husband, in 25% of his military pension. The family court rejected Smith's defense of laches and ordered him to pay Emery 25% of his pension from the date of his first collection through the date of her first collection directly from the government. Smith's motion to reconsider was denied. This appeal follows.

## *STANDARD OF REVIEW*

In appeals from the family court, the court of appeals has jurisdiction to find the facts in accordance with its view of the preponderance of the evidence. *Rutherford v. Rutherford,* 307 S.C. 199, 414 S.E.2d 157 (1992); *Craig v. Craig,* 358 S.C. 548, 595 S.E.2d 837 (Ct.App.2004). This, however, does not require us to disregard the findings of the family court. *Bowers v. Bowers,* 349 S.C. 85, 561 S.E.2d 610 (Ct.App.2002). Neither are we required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Murdock v. Murdock,* 338 S.C. 322, 526 S.E.2d 241 (Ct.App.1999) (citing *Cherry v. Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981)).

## *LAW/ANALYSIS*

### I.   Effect of the Merger of the Agreement into the Decree

In Smith and Emery's divorce decree, the family court judge found that "the parties have requested that this Court should approve this Agreement for enforcement purposes and that the Agreement should merge into any decree or Order of this Court so as to lose its contractual nature." Accordingly, the court's order proclaimed:

That the annexed Agreement entered into by and between [Emery] and [Smith] dated December 12, 1988, be and hereby is, adopted by the Court as a part of this Decree

and is merged into this Decree so as to lose its contractual nature. The parties are hereby directed and ordered to fully and completely comply with the terms and conditions thereof. It is further ordered that both parties shall be subject to the contempt powers and jurisdiction of this Court for enforcement purposes in the future.

By merging the agreement into the decree, the court transformed it from a contract between the parties into a decree of the court. Prior to *Moseley v. Mosier*, 279 S.C. 348, 306 S.E.2d 624 (1983), South Carolina law was unclear as to what specific language rendered an agreement enforceable by the court rather than being merely enforceable as a contract between the parties. The *Moseley* court noted, "Words of art such as 'ratified', 'adopted', 'approved', 'incorporated and []merged', and 'incorporated without merger' consistently have confused attorneys, judges and laymen in this state." *Id.* at 352, 306 S.E.2d at 626.

*Moseley* marked a change in the law. Since *Moseley,* our courts "assume that any settlement in a divorce decree is intended to be judicially decreed unless there is some explicit, clear and plain provision in the court approved separation agreement or the decree." *Id.* at 353, 306 S.E.2d at 627. The effect of an agreement becoming a judicial decree is not to be understated. "With the court's approval, the terms become a part of the decree and are binding on the parties and the court." *Moseley* at 353, 306 S.E.2d at 627; *accord Croom v. Croom,* 305 S.C. 158, 161, 406 S.E.2d 381, 383 (Ct.App.1991). Thereafter, the agreement, as part of the court order, is fully subject to the family court's authority to interpret and enforce its own decrees. *See, e.g., Terry v. Lee (Terry I ),* 308 S.C. 459, 419 S.E.2d 213 (1992) (stating that the family court has exclusive jurisdiction to determine the rights of the parties under an agreement incorporated into a family court decree). Indubitably, what had been a contract between Smith and Emery became appreciably more efficacious when the family court merged the parties' agreement into the court's decree.

## II. Ownership of the Military Retirement Benefits

Military retirement benefits accrued during marriage constitute marital property. *Martin v. Martin,* 296 S.C. 436,

373 S.E.2d 706 (Ct.App.1988); *Curry v. Curry*, 309 S.C. 539, 424 S.E.2d 552 (Ct.App.1992). Consequently, 25% of all of the military retirement benefits Smith has received and will receive belong to Emery pursuant to the 1989 decree. She owns that portion by court order. Indeed, Emery has received her share of Smith's benefits since shortly after commencement of this action. Smith does not dispute her current entitlement to 25% of his pension.

### III. Laches

■ Smith argues that the doctrine of laches should prevent Emery from collecting her 25% share of his benefits dating back to 1991. We disagree.

■ "Laches is neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done." *Mid–State Trust, II v. Wright*, 323 S.C. 303, 474 S.E.2d 421 (1996); *Hallums v. Hallums*, 296 S.C. 195, 371 S.E.2d 525 (1988); *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999). Laches is an equitable doctrine, which arises upon the failure to assert a known right. *All Saints Parish, Waccamaw v. Protestant Episcopal Church in the Diocese of S.C.*, 358 S.C. 209, 235, 595 S.E.2d 253, 267 (Ct.App.2004). Under the doctrine of laches, if a party, knowing his rights does not seasonably assert them, but by unreasonable delay causes his adversary to incur expenses or enter into obligations or otherwise detrimentally change his position, then equity will ordinarily refuse to enforce those rights. *Muir* at 296, 519 S.E.2d at 599. The party seeking to establish laches must show (1) delay, (2) unreasonable delay, and (3) prejudice. *Hallums* at 199, 371 S.E.2d 525, 371 S.E.2d at 528; *All Saints* at 235, 595 S.E.2d at 267.

■ "Importantly, delay alone in assertion of a right does not, in and of itself, constitute laches. Rather, so long as there is no knowledge of the wrong committed and no refusal to embrace an opportunity to ascertain facts, there can be no laches." *Muir* at 296, 519 S.E.2d at 599 (citations omitted); *see Brown v. Butler* 347 S.C. 259, 265, 554 S.E.2d 431, 434 (Ct.App.2001); *compare Wall v. Huguenin* 305 S.C. 100, 406 S.E.2d 347 (1991) (holding the failure to exercise an option to

purchase land for thirteen years was not unreasonable and laches did not apply) *with Chambers of S.C., Inc. v. County Council for Lee County,* 315 S.C. 418, 434 S.E.2d 279 (1993) (finding contractor's six-month delay in taking action on its objection to a contract awarded by county to another contractor was barred by laches).

The inquiry into the applicability of laches is highly fact-specific and each case must be judged by its own merits. *Muir* at 297, 519 S.E.2d at 599. Thus, the determination of whether laches has been established is largely within the discretion of the trial court. *Brown v. Butler,* 347 S.C. at 265, 554 S.E.2d at 434 (Ct.App.2001); *Gibbs v. Kimbrell,* 311 S.C. 261, 269, 428 S.E.2d 725, 730 (Ct.App.1993). The burden of proof is on the party asserting laches. *Muir,* 336 S.C. at 297, 519 S.E.2d at 599. Finally, laches is an affirmative defense and must be pled. Rule 8(c), SCRCP; *Mack v. Edens,* 306 S.C. 433, 412 S.E.2d 431 (Ct.App.1991).

The doctrine of laches is well established in South Carolina's domestic relations jurisprudence. In *Appeal of Brown,* 288 S.C. 530, 343 S.E.2d 649 (Ct.App.1986), this Court affirmed the trial court's decree that laches did not bar an ex-wife from asserting a nineteen-year-old claim to over $37,000 in child support arrearages, against her ex-husband's estate. There, ex-husband disappeared in 1963 and ex-wife testified that she was unable to locate him until 1972. *Id.* at 532, 343 S.E.2d at 650. Ex-husband died in 1982, at which time ex-wife filed her claim against his estate. *Id.* The order of the probate court, finding that ex-wife was not barred by laches, was affirmed by the circuit court's decree. 288 S.C. at 531, 343 S.E.2d at 650. Concluding that ex-wife "made some effort to secure support from her former husband," we held that ex-wife's actions were not consistent with an abandonment of her rights, and thus the probate court's findings were not manifestly erroneous. *Id.* at 535, 343 S.E.2d at 652.

*Hallums* involved a wife's claim to retroactive child support. In *Hallums,* husband and wife separated in 1968, and wife assumed custody of their daughter. 296 S.C. at 196, 371 S.E.2d at 526. Husband initiated divorce proceedings, and in his petition, he stated that he would pay $10 per week in child support. *Id.* However, wife did not respond, and the suit was

never adjudicated. *Id.* Then, in 1987, husband again filed a petition for divorce, and wife counterclaimed for past-due child support. *Id.* Our supreme court, finding that laches applied, reversed the family court's award of retroactive child support. The court noted: "The mother never brought any formal adjudicatory proceeding against the father. Since the mother had sixteen years during which she could have enforced her right ∙ ..., we hold that twenty-two years constituted a delay." *Id.* at 199, 371 S.E.2d at 528.

*Jefferson Pilot Life Ins. Co. v. Gum* is an especially edifying decision as it turned on the existence of a court-ordered obligation. 302 S.C. 8, 393 S.E.2d 180 (1990). In *Gum,* husband and wife were divorced in 1974. The divorce decree required ex-husband to retain his ex-wife as the beneficiary of an insurance policy that he currently held. *Id.* at 9, 393 S.E.2d at 181. In 1980, the parties were back in family court with ex-husband seeking a reduction in alimony. Ex-husband was not in compliance with the prior order and the judge again "ordered [ex-husband] to take steps immediately to make [ex-wife] the beneficiary on the Jefferson Pilot life insurance policy," but he still did not comply. *Id.*

Ex-husband died in 1987, and both ex-wife and second wife filed claims for the proceeds of the Jefferson Pilot insurance policy. *Id.* at 10, 393 S.E.2d at 181. The trial judge granted summary judgment in favor of second wife finding that "[ex-wife] had not acted with reasonable diligence when she failed to obtain a judicial determination ... after she became aware that she was no longer the named beneficiary." *Id.* at 11, 393 S.E.2d at 182. The supreme court disagreed: "[Ex-husband] was under a judicial order to maintain [ex-wife] as the beneficiary of a life insurance policy.... In the absence of a modification of the order, ... [ex-husband] was still under an obligation to designate [ex-wife] as the beneficiary of the policy." *Id.*

In *Terry v. Lee (Terry II )*, ex-wife first initiated a claim in 1990 to partition her ex-husband's military retirement benefits based on a 1968 divorce. 314 S.C. 420, 445 S.E.2d 435 (1994). Our supreme court affirmed the family court's dismissal of the ex-wife's claim, partly on the basis of laches. Although federal law precluded ex-wife from asserting property rights in her

ex-husband's retirement benefits in 1968, by 1983 Congress had passed legislation allowing a party to obtain property rights in an ex-spouse's military retirement benefits. The *Terry II* court stated:

[Ex-husband] retired in 1973, a right to the retirement arguably arose in 1983, and now after at least ten more years of inaction, [ex-wife] is pursuing this claim on a twenty-seven year old divorce decree. Against these facts, it is clear to us that her delay is unreasonable and that the doctrine of *laches* is applicable to bar any further claim against [ex-husband's] military retirement.

*Id.* at 426–27, 445 S.E.2d at 438.

*South Carolina Dep't of Social Serv. v. Holden,* 319 S.C. 72, 459 S.E.2d 846 (1995), involved an action brought by an ex-wife to enforce a child support obligation imposed in a nineteen-year-old divorce decree. There, the South Carolina Supreme Court affirmed the family court's ruling that ex-husband repay over $32,000 in arrears at the rate of $25 per month. The court determined:

Since the divorce she continually asked Father to pay child support, but he refused. She contacted the Attorney General's office and was advised that her chances of collecting from Father were "not very good" considering his sporadic work history. She again contacted the Attorney General's office when she discovered that Father was employed in Florida, but was told that it would cost $300 to file an action for support. Mother did not have sufficient funds to pursue the action.

*Id.* at 76, 459 S.E.2d at 848. Accordingly, the *Holden* court found that ex-wife was not unjustified in her delay. *Id.* Further, because ex-husband was ordered to repay the arrearages at a mere $25 per month, he did not suffer prejudice. *Id.*

In *Cannon v. Cannon,* 321 S.C. 44, 467 S.E.2d 132 (Ct.App. 1996), this Court affirmed the family court's requirement that ex-husband repay $30,500 in temporary support based on a pendente lite order that was almost four years old before a divorce action was finally tried. In 1988, the family court ordered ex-husband to pay $500 per month as temporary support. *Id.* at 52, 467 S.E.2d at 136. In September of 1988, the divorce action was administratively terminated, and in

March of 1989, ex-husband stopped paying the temporary support. *Id.* at 52, 467 S.E.2d at 137. However, the family court, in the 1992 action, found that the pendente lite order was still in effect. *Id.* We denied ex-husband's laches defense, concluding that he was not prejudiced by the delay and had not established laches as an affirmative defense. *Id.*

Turning to the case at bar, we find no unreasonable delay. Smith was under a duty to inform Emery of his retirement. He was to "provide any and all information necessary and sign any and all forms or documents necessary or convenient" in order for Emery to receive her share of his benefits. This he did not do. As in *Gum,* the duty imposed upon Smith emanates from the specific provision in the order of the family court. Emery's ten-year delay in enforcing her rights came as a result of Smith's own failure to comport with the court decree. Smith admitted that he did not inform his ex-wife of his retirement, and the family court found credible Emery's testimony that she did not know Smith had retired. Thus, it was Smith who acted unreasonably by failing to honor his duty to Emery. Accordingly, there is no failure to assert a known right by Emery, and Smith has not met the unreasonableness element of laches. *See Muir,* 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999) ("The failure to assert a right does not come into existence until there is a reason or situation that demands assertion, for purposes of doctrine of laches.") (citation omitted). Laches cannot possibly act as a bar to Emery's receipt of the benefits when her delay was caused by Smith's failure to act according to the decree.

Smith seems to claim that since Emery was able to establish her current receipt of 25% of his benefits without any action on his part, the duty imposed by the decree was illusory. But this position ignores his obligation to inform Emery that he had retired and was receiving benefits. Otherwise, the provision of the decree imposing the duty upon Smith would be rendered meaningless.

Smith relies on *Terry II, supra,* as support for his laches defense. However, we find *Terry II* easily distinguishable. *Terry II* involved a wife's attempt to establish a right to her ex-husband's military retirement benefits some twenty-two years after the parties divorced. Here, **Emery seeks to**

*enforce—not establish—her rights in Smith's retirement benefits.* Additionally, the former husband in *Terry II* was not bound by a court order to take the necessary steps to ensure his former wife would receive her portion of his military benefits.

Smith cites *Henderson v. Puckett,* 316 S.C. 171, 447 S.E.2d 871 (Ct.App.1994) for support. Smith's reliance on this case is also misplaced because *Henderson* dealt with a contempt action against a father who had failed to pay child support. The language Smith cites comes from a footnote in the dissenting opinion, which mentions the trial court's criticism of the mother for delaying fourteen years in pursuing the claim. *Id.* at 176, n. 2, 447 S.E.2d at 874 n. 2. While the footnote briefly mentions the doctrine of laches, the issue was not discussed by the *Henderson* majority.

Finally, we note that as an equitable defense, the application of laches is a matter of discretion, not of right. Significantly, in *Brown, Terry II, Holden,* and *Cannon,* the trial court's decision regarding laches was affirmed. Of course, an appellate tribunal's deference to the trial court is not absolute, as demonstrated by the supreme court's reversal of the trial courts in *Hallums* and *Gum.* Nonetheless, we reiterate the fact-specific nature of the application of laches and give credence to the trial judge in affirming her decision.

## IV. Smith's Unclean Hands

In addition to our finding that Emery acted reasonably, we agree with her and the trial court that in any event Smith is precluded from asserting laches due to his own unclean hands. Laches is a defense in equity, and one who comes to the court seeking equity must come with clean hands. *See Precision Instrument Mfg. Co. v. Automotive Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("He who comes into equity must come with clean hands. It is far more than a mere banality. It is a self-imposed ordinance that closes the door of the court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."); *Wilson v. Landstrom,* 281 S.C. 260, 315 S.E.2d 130 (Ct.App.1984) ("The doctrine of unclean hands precludes a plaintiff from recovering in equity if he acted unfairly in a

matter that is the subject of the litigation to the prejudice of the defendant.") (quotations and citations omitted). We find Smith's hands are unclean because he failed to inform Emery that: (1) he was retired; (2) was receiving benefits; and (3) Emery was entitled to her 25% share.

## V. Manner of Payment

The family court required full payment of the delinquency within sixty days of the entry of the order. We modify the requirement that Smith pay the full amount in lump sum and remand to the family court for the specific purpose of determining the amount of delinquency and to set a reasonable and proper schedule of repayment.

## CONCLUSION

Based on the foregoing, we find the trial judge properly found that Emery was entitled to 25% of all retirement benefits due to her under the divorce decree. Accordingly, the judgment of the trial court is

**AFFIRMED AS MODIFIED and REMANDED.**

GOOLSBY and WILLIAMS, JJ., concur.